STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Devin W. FELIX, Defendant-Appellant.

Supreme Court

*No. 2010AP346–CR. Oral argument November 9, 2011.
—Decided April 3, 2012.*

2012 WI 36

(Also reported in 811 N.W.2d 775.)

670

For the plaintiff-respondent-petitioner the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For the defendant-appellant there was a brief and oral argument by *Leonard D. Kachinsky* and *Sisson & Kachinsky Law Offices*, Appleton.

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished decision of the court of appeals reversing the circuit court's judgment of conviction for second-degree intentional homicide after a plea of guilty.[1] This case involves statements and physical evidence obtained from a defendant outside of the home after *Miranda* warnings[2] were given and waived following a warrantless in-home arrest made in alleged violation of *Payton v. New York*.[3] The central issue presented in this case is which analysis governs the admissibility of such evidence: does Article I, Section 11 of the Wisconsin Constitution demand the suppression of such evidence unless it is sufficiently attenuated under *Brown v. Illinois*,[4] or does this court adopt the rule developed by the United States Supreme Court in *New York v. Harris*[5] under its interpretation of the Fourth Amendment to the United States Constitution? The United States Supreme Court set forth a three-factor attenuation analysis in *Brown* to determine whether evidence

[1] *State v. Felix*, No. 2010AP346–CR, unpublished slip op. (Wis. Ct. App. Mar. 29, 2011).

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] 445 U.S. 573 (1980).

[4] 442 U.S. 590 (1975).

[5] 495 U.S. 14 (1990).

obtained following an unlawful search or seizure must be suppressed under the exclusionary rule as the fruit of a Fourth Amendment violation.[6] In *Harris,* the United States Supreme Court clarified that where the Fourth Amendment violation is an unlawful arrest without a warrant, in violation of *Payton,* but with probable cause, evidence obtained from the defendant outside of the home is admissible because it is not "the product of illegal governmental activity."[7]

¶ 2.    In the early morning of September 8, 2007, a violent fight erupted outside of a house where a party was being held. After the fight, Nathaniel Davids (Davids) was left bleeding from multiple stab wounds and later died from those wounds. Police had probable cause to arrest Devin Felix (Felix) for Davids' murder based on statements from several witnesses, but police did not obtain a warrant for his arrest. Police arrested Felix at his home, and he was charged with first-degree intentional homicide. Before trial, Felix sought to suppress statements and evidence that police obtained at the police station and the jail.

¶ 3.    Relevant to this appeal, the circuit court denied in part[8] Felix's motions to suppress statements and physical evidence obtained after police arrested him at his home without an arrest warrant. The circuit

[6] *Brown,* 442 U.S. at 603–04.

[7] *Harris,* 495 U.S. at 17–19 (quoting *United States v. Crews,* 445 U.S. 463, 471 (1980)).

[8] The circuit court granted in part Felix's motion to suppress the statement that he made outside of his residence immediately after he was arrested because police had not read Felix his *Miranda* warnings. The circuit court concluded that this statement could not be used in the State's case-in-chief, but could be used for impeachment purposes because it was made voluntarily.

court concluded that Felix did not have a reasonable expectation of privacy because he had submitted himself to public view by sleeping in front of an unsecured door that flew open easily. The court of appeals applied a *Brown* attenuation analysis and reversed in part the circuit court. Following the State's assumption that the arrest was unlawful in violation of *Payton* and the Fourth Amendment, the court of appeals remanded for a trial with directions to suppress Felix's signed statement at the police station, a buccal swab Felix agreed to provide for DNA comparison and his clothing because the court of appeals concluded that they were not sufficiently attenuated from the unlawful arrest.[9] The court of appeals did not apply the *Harris* rule because it concluded that this court had not adopted the *Harris* rule and that the rule conflicted with this court's precedent.[10] The court of appeals suggested that this court's decisions indicate that Article I, Section 11 provides more protection than the *Harris* Court's interpretation of the Fourth Amendment.[11]

¶ 4. We continue our usual practice of interpreting Article I, Section 11 of the Wisconsin Constitution in accord with the United States Supreme Court's interpretation of the Fourth Amendment. Thus, we adopt the *Harris* exception to the exclusionary rule for certain evidence obtained after a *Payton* violation. We hold that, where police had probable cause to arrest before the unlawful entry, a warrantless arrest from Felix's home in violation of *Payton* requires neither the suppression of statements made outside of the home after Felix was given and waived his *Miranda* rights,

---

[9] *Felix,* No. 2010AP346–CR, ¶¶ 1, 20.

[10] *Id.,* ¶¶ 14–19.

[11] *Id.,* ¶ 19.

nor the suppression of physical evidence obtained from Felix outside of the home. Assuming without deciding that Felix's warrantless arrest from his home was in violation of *Payton,* we conclude that, pursuant to the *Harris* rule, the following evidence that police obtained outside of his home is admissible: Felix's signed statement, made after Felix was given and waived his *Miranda* rights, the buccal swab obtained at the police station, and Felix's clothing seized at the jail, as well as any derivative evidence.[12]

¶ 5.   Therefore, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

## I. FACTUAL BACKGROUND

¶ 6.   In the early morning on September 8, 2007, a violent fight erupted outside of a party in the City of Schofield, Marathon County, Wisconsin. Officers responded after the fight had broken up and people had fled the scene. They discovered Davids lying bleeding in the middle of the street from multiple stab wounds. Davids was taken to the hospital and later pronounced dead. After police interviewed witnesses, they located,

---

[12] The parties focused their arguments on the suppression of the buccal swab and the clothes themselves. The record does not indicate whether DNA or blood evidence was taken from the swab or the clothing nor does it provide the results of any DNA or blood comparison with the victim. It is reasonable to infer that Felix sought to suppress the DNA from the swab, the blood derived from the clothing and the results of tests on those samples, as well as the swab and the clothing themselves. Thus, when we refer to the suppression of the buccal swab and Felix's clothing, we include any evidence derived therefrom or the results of any tests on that evidence.

arrested, and obtained evidence and a statement from Felix all during the morning hours of that same day.

¶ 7.  Shortly after arriving at the scene, police interviewed several people who were still present and also located several other witnesses who had attended the party. The witnesses who live near the scene stated that during the fight they had heard someone shouting about a stabbing. At the police station, detectives interviewed several people who had attended the party. T.W., a minor at the time of the homicide, described the fight that broke out among approximately six people outside of the party. T.W. stated that she heard Felix say, "I'm going to prison. I stabbed someone. I think I killed him." T.W. had responded, "[N]o you didn't, no you didn't, I think you're lying." According to T.W., Felix then stated, "I'm not lying, I've got blood all over me." T.W. told police that she was "pretty positive" or about "98" percent sure that Felix stabbed someone. T.W. also said that Felix left in a green Chrysler. A detective also interviewed Kyle Leder who reported hearing Felix say the word "stab" and also "I'm not going to prison" shortly before he saw Felix leave in a green Chrysler.

¶ 8.  Based on this information, police obtained a warrant to search the residence where the party had taken place for Felix, witnesses and any evidence of the crime. Police did not find Felix at that residence, but eventually learned from Felix's father that he was living at Felix's mother's apartment. Felix's father gave the police a description of the residence and told them that the rear entrance led to the Felixes' apartment. When the police went to that residence they saw a green Chrysler parked in the driveway, which matched the description witnesses had given of the car that Felix had driven from the scene. The police had also discovered that the car was registered to Felix's mother.

¶ 9.	When a detective knocked on the rear door of the residence, it popped open. The detective could immediately see someone, whom he recognized as Felix from a photo, sleeping in a recliner at the bottom of the stairs leading to the door. The detective and another officer drew their weapons and ordered Felix to come out with his hands up. Felix complied and was searched and handcuffed outside of the residence.

¶ 10.	When Felix was being patted down before he was handcuffed, an officer asked Felix if he had any sharp objects on him. Felix replied that he had a knife in his pocket. When the officer did not find a knife on Felix, Felix stated that he "had a knife on [him]," but "must have gotten rid of it."

¶ 11.	When officers located the person who was renting the apartment and subletting to the Felixes, Dean Kudick (Kudick), an officer asked Kudick for permission to search the house, which Kudick granted. Police found a knife next to the recliner where Felix had been sleeping. Police seized the knife and the green Chrysler that was parked in the driveway.

¶ 12.	Felix was taken to the police department and placed in an interview room. A detective read Felix his *Miranda* rights and Felix signed a form waiving those rights. Felix then provided a statement detailing his involvement in the fight and Davids' death. The detective transcribed his questions and Felix's responses throughout the interview, and Felix signed this written statement after he had an opportunity to review it. Felix then agreed to submit to a buccal swab for DNA analysis.

¶ 13.	Felix was transported to the jail where the detective asked Felix to remove his clothes and place each item in an individual evidence bag. The detective stated that he decided to take Felix's clothes as evidence at the jail because during the interview he had noticed

that Felix had some "red spots" on his shirt that he suspected might have been blood.

## II. PROCEDURAL HISTORY

¶ 14. Felix was charged with first-degree intentional homicide with the use of a dangerous weapon contrary to Wis. Stat. § 940.01(1)(a) and § 939.63(1)(b) (2005–06).[13] Felix made several pre-trial motions including four motions to suppress statements and evidence. Specifically, Felix sought to suppress (1) the statement he made while being patted down upon his arrest that he "had a knife on [him]," but "must have gotten rid of it," (2) his signed statement at the police station, (3) the buccal swab he provided at the police station for DNA comparison, (4) the clothing he was wearing when arrested that police seized at the jail, (5) the knife police seized from his apartment, and (6) evidence obtained from his green Chrysler. The Marathon County Circuit Court, the Honorable Dorothy L. Bain presiding, held hearings on Felix's motions to suppress.

---

[13] Wisconsin Statute § 940.01 (2005–06) provides: "First-degree intentional homicide. (1) Offenses. (a) Except as provided in sub. (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony."

Wisconsin Statute § 939.63 provides: "Penalties; use of a dangerous weapon. (1) If a person commits a crime while possessing, using or threatening to use a dangerous weapon, the maximum term of imprisonment prescribed by law for that crime may be increased as follows: . . . (b) If the maximum term of imprisonment for a felony is more than 5 years or is a life term, the maximum term of imprisonment for the felony may be increased by not more than 5 years."

All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

¶ 15. The Marathon County Circuit Court, the Honorable C.A. Richards presiding, granted in part and denied in part Felix's motions. The circuit court began with its conclusion that Felix was lawfully arrested. It noted that Felix was sleeping in a recliner in plain view of a door to the apartment that was known to pop open. According to the circuit court, the arrest was valid because Felix had voluntarily submitted himself to public view and thus had no reasonable expectation of privacy protected by the Fourth Amendment. The circuit court explained, quoting *United States v. Santana,* 427 U.S. 38, 42 (1976), what "a person knowingly exposes to the public, even in his own house or office, . . . is not a subject of [F]ourth [A]mendment protection."[14]

¶ 16. Thus, because the circuit court concluded that Felix's arrest was not a violation of his Fourth Amendment rights, it also concluded that Felix's signed statement, the buccal swab provided at the police station, and his clothing seized at the jail were not tainted by any constitutional violation and were admissible. The circuit court denied Felix's motion to suppress the knife that police discovered in his apartment because the circuit court concluded that Kudick provided valid consent to search that area. The circuit court suppressed the statement Felix made outside of his residence, that he "had a knife on [him]," but "must have gotten rid of it," because Felix had not been given *Miranda* warnings. While that statement could not be used in the State's case-in-chief, the circuit court deter-

---

[14] Before this court, the State does not advance the argument that the arrest was lawful based on the reasoning of the circuit court. Rather, the State's argument before this court presumes that the arrest was made in violation of *Payton,* 445 U.S. at 590. Consistent with the parties' positions, we assume, without deciding, that Felix's arrest at his home without an arrest warrant was in violation of *Payton. See infra* ¶ 29.

mined that because the statement was made voluntarily, it could be used for impeachment purposes.[15]

¶ 17. Felix pleaded guilty to the charge in the amended information of second-degree intentional homicide contrary to Wis. Stat. § 940.05(1)(b).[16] Felix was sentenced to 28 years of initial confinement and 20 years on extended supervision.

¶ 18. Felix appealed the circuit court's denial of the suppression motion,[17] and the court of appeals affirmed in part and reversed in part the circuit court's decision. *State v. Felix,* No. 2010AP346–CR, unpublished slip op., ¶ 1 (Wis. Ct. App. Mar. 29, 2011). The court of appeals remanded for a trial with directions to suppress Felix's signed statement and the buccal swab provided at the police station, and his clothing that police seized at the jail. *Id.*

¶ 19. Following the State's assumption that Felix's arrest violated *Payton,* the court of appeals addressed whether *Harris* or *Brown* provided the proper analysis

---

[15] *State v. Mendoza,* 96 Wis. 2d 106, 118, 291 N.W.2d 478 (1980) ("A statement of the defendant made without the appropriate *Miranda* warnings, although inadmissible in the prosecution's case-in-chief, may be used to impeach the defendant's credibility if the defendant testifies to matters contrary to what is in the excluded statement." (citing *Harris v. New York,* 401 U.S. 222 (1971))).

[16] Wisconsin Statute § 940.05 provides: "Second-degree intentional homicide. (1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class B felony if: . . . (b) The state concedes that it is unable to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01 (2) did not exist. By charging under this section, the state so concedes."

[17] A defendant may appeal an order denying a motion to suppress despite the fact that the final judgment was entered upon the defendant's guilty plea. Wis. Stat. § 971.31(10).

regarding the suppression of evidence later obtained from Felix. *Id.*, ¶ 19. The court of appeals declined to apply the *Harris* exception to the exclusionary rule because it had not yet been adopted by this court, and because the court of appeals concluded that *Harris* conflicted with this court's decisions in *Laasch v. State*, 84 Wis. 2d 587, 267 N.W.2d 278 (1978), *State v. Smith*, 131 Wis. 2d 220, 388 N.W.2d 601 (1986), and *State v. Walker*, 154 Wis. 2d 158, 453 N.W.2d 127 (1990). *Id.*, ¶¶ 14–15, 19. The court of appeals also noted that after *Harris* was decided, this court applied the *Brown* analysis in *State v. Anderson*, 165 Wis. 2d 441, 477 N.W.2d 277 (1991), and *State v. Phillips*, 218 Wis. 2d 180, 577 N.W.2d 794 (1998), involving the suppression of evidence obtained following a warrantless home entry and search. *Id.*, ¶¶ 16–17. The court of appeals concluded that it would be "peculiar" to admit evidence obtained after a warrantless home entry and arrest under *Harris* and to analyze evidence obtained after a warrantless home entry and search under *Brown*. *Id.*, ¶ 18. Although the court of appeals recognized that Article I, Section 11 has typically been interpreted in accord with the Fourth Amendment, the court of appeals stated that it was constrained by this court's prior decisions. *Id.*, ¶ 19. Applying *Brown*, the court of appeals remanded with directions to suppress Felix's signed statement, the buccal swab provided at the police station, and his clothing seized at the jail as not sufficiently attenuated from the illegal arrest.[18] *Id.*, ¶ 20.

---

[18] The court of appeals declined to address Felix's argument that both of his statements were involuntary and that his *Miranda* waiver at the police station was invalid because the court of appeals remanded for suppression on other grounds. *Felix*, No. 2010AP346–CR, ¶ 1 n.1.

¶ 20. The court of appeals affirmed the circuit court's decision to admit the knife and any evidence obtained from the green Chrysler. *Id.*, ¶¶ 21–22. According to the court of appeals, the knife was admissible because it was seized in a search conducted pursuant to Kudick's valid consent. *Id.*, ¶ 21. The court of appeals did not remand to suppress the evidence obtained from the green Chrysler because the police had probable cause to search and did not need a search warrant to seize the vehicle. *Id.*, ¶ 22.

¶ 21. The State petitioned this court for review, which we granted. The State asks this court to resolve whether under Article I, Section 11 the *Harris* rule or the three-factor *Brown* attenuation analysis governs the suppression of evidence obtained following an arrest in violation of *Payton*. The State also asks this court to determine, under the applicable analysis, whether Felix's signed statement and the buccal swab he provided at the police station, and Felix's clothes that were obtained at the jail must be suppressed.[19]

---

[19] Felix did not file a cross-petition in this court for review. While he argued before the circuit court and the court of appeals that his statements were involuntary and his *Miranda* waiver invalid, he did not raise these issues in his briefs or at oral argument before this court. In fact, in Felix's brief he clarified that he "is no longer arguing before this court that his statement to [the detective] was involuntary due to police misconduct." The circuit court suppressed the statement Felix made in his yard because he had not been given *Miranda* warnings, but concluded that it was voluntary. The circuit court denied Felix's motion to suppress his signed statement at the police station because it concluded that his arrest was lawful and that prior to making this statement he was given and waived his *Miranda* rights. The circuit court did not address Felix's argument that his signed statement at the police station was involuntary.

## III. STANDARD OF REVIEW

¶ 22. This court reviews a motion to suppress under a two-prong analysis. *State v. Eason,* 2001 WI 98, ¶ 9, 245 Wis. 2d 206, 629 N.W.2d 625. "First, we review the circuit court's findings of historical fact, and will uphold them unless they are clearly erroneous. Second, we review the application of constitutional principles to those facts de novo." *Id.* Whether police conduct violated a defendant's constitutional rights under Article I, Section 11 of the Wisconsin Constitution and the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures presents a question of constitutional fact that this court independently reviews. *State v. Griffith,* 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72.

## IV. ANALYSIS

¶ 23. Because Felix raised multiple challenges to statements and evidence that police obtained following his arrest, we begin by clarifying the evidence at issue before this court. The State appealed the court of appeals decision regarding the suppression of Felix's written, signed statement at the police station, the

The court of appeals declined to address these issues because it remanded to suppress Felix's signed statement on other grounds. *Felix,* No. 2010AP346–CR, ¶ 1 n.1. Felix did not ask this court, in his briefs or at oral argument, for a remand to the court of appeals to allow it to address these issues. Thus, we do not address the voluntariness of Felix's statements or the validity of his *Miranda* waiver nor do we remand to the court of appeals to address these issues because Felix apparently has abandoned these arguments and has not asked for a remand to the court of appeals.

buccal swab that he provided at the police station, and Felix's clothing that police seized at the jail. These are the only matters at issue in this appeal.

¶ 24. The State urges this court to interpret Article I, Section 11[20] consistent with the Fourth Amendment[21] and to adopt the *Harris* rule. The State asserts that the court of appeals erroneously concluded that this court's previous decisions conflicted with the *Harris* rule. The State notes that *Laasch,* 84 Wis. 2d 587, *Smith,* 131 Wis. 2d 220, and *Walker,* 154 Wis. 2d 158, were decided *before Harris,* and that *Anderson,* 165 Wis. 2d 441, involved an unlawful entry and search, which is not covered by the *Harris* rule. Instead, the State asserts that the court of appeals was bound by its decision in *State v. Roberson* adopting the *Harris* rule. 2005 WI App 195, 287 Wis. 2d 403, 704 N.W.2d 302, *aff'd on other grounds,* 2006 WI 80, 292 Wis. 2d 280, 717 N.W.2d 111. The State asks this court to continue with its usual past practice and interpret Article I, Section 11 consistent with the Fourth Amendment.

---

[20] Article I, Section 11 of the Wisconsin Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

[21] The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

¶ 25. If this court adopts the *Harris* rule, the State asserts that Felix's signed statement, the buccal swab he provided at the police station, and Felix's clothing seized at the jail are all admissible. While *Harris* dealt with a defendant's statements, the State argues that its rationale also applies to Felix's clothes, and presumes that the *Harris* rule applies to the buccal swab. According to the State, the court of appeals erroneously concluded that Felix's clothes must be suppressed even under *Harris* by relying on a Massachusetts Supreme Judicial Court case, *Commonwealth v. Tyree*, 919 N.E.2d 660 (Mass. 2010), which the State asserts incorrectly interprets *Harris* and is distinguishable. Even if the clothing should have been suppressed under *Harris*, the State argues that the error was harmless because there is no reasonable probability that Felix would have decided not to plead guilty, given the rest of the evidence against him, and the significantly reduced exposure to jail time he received with the plea. If this court declines to adopt the *Harris* rule and instead applies *Brown*, then the State asserts that Felix's statements and the buccal swab he provided at the police station are sufficiently attenuated and admissible.[22]

¶ 26. Felix argues that the *Brown* attenuation analysis governs the suppression of the statement and the other physical evidence because the *Harris* rule conflicts with this court's decisions and Article I, Section 11. According to Felix, applying a *Brown* analysis in this case is consistent with this court's decisions in *Laasch*, 84 Wis. 2d 587, *Smith*, 131 Wis. 2d 220, and *Walker*, 154 Wis. 2d 158, which predate *Harris*. Felix

---

[22] The State makes no argument in regard to the application of the *Brown* attenuation analysis to Felix's clothes.

further argues that applying *Brown* is consistent with *Anderson,* 165 Wis. 2d 441, and *Phillips,* 218 Wis. 2d 180, which applied the *Brown* analysis after the United States Supreme Court decided *Harris*. Felix asserts that this court should conclude, as it did in *Eason,* 245 Wis. 2d 206, that this is a situation in which the United States Supreme Court's interpretation of the Fourth Amendment does not protect a defendant's Article I, Section 11 rights. Felix finds it significant that this court did not adopt *Harris* in *Anderson* because, even though that case involved the fruit of unlawful searches, it would be "peculiar" to have different analyses for unlawful searches and seizures. If this court adopts *Harris,* then Felix argues that his clothing should be suppressed because the *Harris* rule applies only to statements and not tangible evidence, *see Tyree,* 919 N.E.2d at 679–82. According to Felix, if this court concludes that the clothing should have been suppressed, it is unclear whether the harmless error test applies and this court should decline to apply it here. He argues that, if this court applies the *Brown* attenuation analysis, then the signed statement, the buccal swab, and his clothing should be suppressed.

¶ 27.   We first examine whether *Brown* or *Harris* governs the suppression of the physical evidence and written, signed statement at issue here. Both of these decisions address whether evidence or statements obtained following some unlawful police activity must be suppressed. *Brown,* 422 U.S. at 591–92; *New York v. Harris,* 495 U.S. 14, 17 (1990). Specifically, the *Harris* rule applies to evidence and statements obtained from a defendant outside of the home where police had probable cause to arrest the defendant, but arrested him in his home without a warrant. 495 U.S. at 21. Thus, two

688

threshold matters we need to resolve are whether the police had probable cause and whether Felix was unlawfully arrested.

■■

¶ 28.  We conclude that police had probable cause to arrest Felix prior to going to Felix's apartment. Police have probable cause to arrest if they have "information which would lead a reasonable police officer to believe that the defendant probably committed a crime." *West v. State,* 74 Wis. 2d 390, 398, 246 N.W.2d 675 (1976); *see also* Wis. Stat. § 968.07(1)(d). Felix does not dispute that police had probable cause to arrest him. All of the witnesses that police interviewed led them to Felix. Specifically, we note that T.W. stated that after the fight she heard Felix say "I'm going to prison. I stabbed someone. I think I killed him." Also, T.W. told police that she was "pretty positive" or about "98" percent sure that Felix stabbed someone. Kyle Leder told police that he heard Felix yell "stab" and "I'm not going to prison" before Felix left in a green Chrysler. Police had ample information to lead a reasonable officer to believe that Felix probably committed a crime by stabbing Davids.

¶ 29.  Regarding the legality of Felix's arrest, the United States Supreme Court held in *Payton v. New York* that, even if police have probable cause to arrest a defendant, entering the defendant's home without a warrant to accomplish an arrest violates the Fourth Amendment. 445 U.S. 573, 590 (1980). Even before the U.S. Supreme Court decided *Payton,* this court held in *Laasch,* 84 Wis. 2d at 595–97, that a warrantless entry and arrest in a defendant's home violates Article I, Section 11 and the Fourth Amendment. *See Payton,* 445 U.S. at 575 n.3 (citing *Laasch* with approval). In this case, the premise that Felix's arrest was unlawful in violation of *Payton* underlies both of the parties' briefs

and the State's petition asking this court to decide the novel issue of whether *Brown* or *Harris* applies to the suppression of evidence obtained after a *Payton* violation. Consistent with the parties' positions, we assume, without deciding, that Felix's arrest at his home without an arrest warrant was in violation of *Payton,* 445 U.S. at 590.

¶ 30.   Because police obtained Felix's written, signed statement, the buccal swab, and his clothing following his unlawful arrest, Felix argues that this evidence must be suppressed under the exclusionary rule. The exclusionary rule provides for the suppression of evidence that "is *in some sense* the product of the illegal governmental activity." *State v. Knapp,* 2005 WI 127, ¶ 22, 285 Wis. 2d 86, 700 N.W.2d 899 (quoting *Nix v. Williams,* 467 U.S. 431, 444 (1984)). "The primary purpose of the exclusionary rule 'is to deter future unlawful police conduct.' " *Id.* (quoting *United States v. Calandra,* 414 U.S. 338, 347 (1974)). It is a judicially-created rule that is not absolute, but rather requires the balancing of the rule's remedial objectives with the "substantial social costs exacted by the exclusionary rule." *Id.,* ¶¶ 22–23 (quoting *Illinois v. Krull,* 480 U.S. 340, 352–53 (1987)). This rule extends to both tangible and intangible evidence that is the fruit of the poisonous tree, or, in other words, evidence obtained "by exploitation of" the illegal government activity. *Id.,* ¶ 24 (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963)).

¶ 31.   In *Brown,* the United States Supreme Court set forth the following three-factor test for whether evidence obtained following unlawful police conduct must be suppressed under the exclusionary rule as the fruit of the poisonous tree, or whether it is admissible

as sufficiently attenuated from the illegality: (1) "[t]he temporal proximity" between the illegal activity and the evidence, (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." 422 U.S. at 603–04.

¶ 32. After *Brown* was decided in 1975, and before the United States Supreme Court decided *Harris* in 1990, this court applied the *Brown* attenuation analysis in *Smith* and *Walker*, which involved the suppression of evidence obtained from a defendant outside of the home following an arrest in violation of *Payton*. In *Smith*, police had probable cause to arrest, but unlawfully entered Smith's home and arrested him without a warrant or the presence of any exigent circumstances in violation of Article I, Section 11 and the Fourth Amendment. 131 Wis. 2d at 232–35. Smith later confessed during an interrogation. *Id.* at 226. This court suppressed the statements under *Brown* in an abbreviated analysis based on the State's concession that if the arrest was unlawful, then Smith's statements would be suppressed as insufficiently attenuated from the unlawful arrest. *Id.* at 241–42.

█

¶ 33. In *Walker*, this court stated that *Brown* governed the analysis of the lineup identifications made after Walker was unlawfully arrested from the backyard of his home in violation of the Fourth Amendment prohibitions articulated in *Payton* and *Oliver v. United States*, 466 U.S. 170, 180 (1984).[23] *Walker*, 154 Wis. 2d at 182–87. Police did not have an arrest warrant, but

---

[23] *Oliver* provides that Fourth Amendment protections extend to the curtilage of the home, which includes "the land immediately surrounding and associated with the home." *Oliver v. United States*, 466 U.S. 170, 180 (1984).

this court assumed that police had probable cause to arrest Walker for burglary. *Id.* at 184. Walker was positively identified by several eyewitnesses to the burglaries in a lineup the morning after his arrest. *Id.* at 162–63. Because this court lacked the necessary information in the record to examine the lineup under the *Brown* factors, we remanded to the circuit court to conduct a *Brown* analysis. *Id.* at 187.

¶ 34. After this court decided *Smith* and *Walker,* the United States Supreme Court decided *Harris,* 495 U.S. 14. There the Court held that even if an arrest violated *Payton,* evidence obtained from the defendant outside of the home while in lawful police custody is not the product of the illegal arrest, so long as police had probable cause to arrest. *Id.* at 21. Such evidence need not be analyzed under *Brown. Id.* at 18–19. In *Harris,* police had probable cause to arrest Harris for murder, but police went to Harris's apartment, entered and arrested him without a warrant. *Id.* at 15–16. The Supreme Court accepted the trial court's finding that Harris did not consent to the police officers' entry and thus he was arrested in violation of *Payton. Id.* at 17. Harris argued that his statement at the police station, after he was given and waived his *Miranda* rights, must be suppressed because it was the fruit of his unlawful arrest. *Id.* at 16.

¶ 35. The United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton.*" *Id.* at 21. The Supreme Court stated that the *Brown* "attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence

692

is in some sense the product of illegal governmental activity.' " *Id.* at 19 (quoting *United States v. Crews,* 445 U.S. 463, 471 (1980)). Harris's statement, which police obtained while Harris was in legal custody at the police station, and after he was given and waived his *Miranda* rights, did not require suppression because it was not the product of the unlawful arrest or of any further illegal governmental activity. *Id.*

■■■

¶ 36. We are bound to follow the United States Supreme Court's interpretation of the Fourth Amendment that sets the minimum protections afforded by the federal constitution. *State v. Ward,* 2000 WI 31, ¶ 39, 231 Wis. 2d 723, 604 N.W.2d 517. However, Felix urges this court to interpret Article I, Section 11 in a manner that provides more deterrence of and protection against unlawful activities and seizures than that provided by the *Harris* rule. As we have previously noted, we are particularly reluctant to do so given the nearly identical language in both provisions.[24] Rather, we have usually interpreted Article I, Section 11 in accord with the United States Supreme Court's interpretation of the Fourth Amendment.[25] We have more

---

[24] *State v. Fry,* 131 Wis. 2d 153, 172, 388 N.W.2d 565 (1986) ("But for a few inconsequential differences in punctuation, capitalization and the use of the singular or plural form of a word, the texts of art. I, sec. 11 and the fourth amendment are identical."), *overruled on other grounds by State v. Dearborn,* 2010 WI 84, 327 Wis. 2d 252, 786 N.W.2d 97; *see supra* notes 20 and 21.

[25] We have interpreted Article I, Section 11 consistent with the Fourth Amendment in the following: *Dearborn,* 327 Wis. 2d 252, ¶ 27; *State v. Ferguson,* 2009 WI 50, 317 Wis. 2d 586, 767 N.W.2d 187; *State v. Arias,* 2008 WI 84, ¶¶ 19–24, 311 Wis. 2d 358, 752 N.W.2d 748; *State v. Malone,* 2004 WI 108, ¶ 15, 274

often interpreted the Wisconsin Constitution differently than the federal constitution in regard to Article I, Sections 7 and 8 than in regard to Article 1, Section 11.[26] "On only one occasion in our development of Article I, Section 11 jurisprudence have we required a showing different from that required by the Supreme Court's Fourth Amendment jurisprudence. We did so in regard to our development of a good faith exception under Article I, Section 11." *State v. Ferguson,* 2009 WI 50 ¶ 17 n.6, 317 Wis. 2d 586, 767 N.W.2d 187. This remains true today.[27]

¶ 37. The sole exception is *Eason,* in which this court adopted a modified good faith exception to the exclusionary rule for officers' reasonable reliance on a

Wis. 2d 540, 683 N.W.2d 1; *State v. Guzman,* 166 Wis. 2d 577, 586–87, 480 N.W.2d 446 (1992); *Fry,* 131 Wis. 2d at 172, *overruled on other grounds by Dearborn,* 327 Wis. 2d 252; *State v. Doe,* 78 Wis. 2d 161, 254 N.W.2d 210 (1977); *State v. Williams,* 47 Wis. 2d 242, 177 N.W.2d 611 (1970).

[26] *See e.g., State v. Dubose,* 2005 WI 126, ¶¶ 39–40, 285 Wis. 2d 143, 699 N.W.2d 582 (Article I, Section 8); *State v. Knapp,* 2005 WI 127, ¶¶ 57–62, 285 Wis. 2d 86, 700 N.W.2d 899 (Article I, Section 8); *State v. Hansford,* 219 Wis. 2d 226, 242–43, 580 N.W.2d 171 (1998) (Article I, Section 7).

[27] Justice Bradley's dissent asserts that *Laasch v. State,* 84 Wis. 2d 587, 267 N.W.2d 278 (1978), is "another occasion in which we interpreted Article I Section 11 more expansively than the existing interpretation of the Fourth Amendment." Dissent, ¶ 131. To the contrary, in *Laasch,* this court explained that our conclusion was premised on both the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution. 84 Wis. 2d at 595. We stated that our conclusion was "in accord with decisions of this court and of the United States Supreme Court." *Id. Laasch* is not an example of a situation in which this court has diverged from the United States Supreme Court's interpretation of the Fourth Amendment on the basis of additional protections provided under Article I, Section 11.

no-knock search warrant. 245 Wis. 2d 206, ¶¶ 2–3. We began by examining this court's long history of interpreting Article I, Section 11 consistent with the United States Supreme Court's interpretation of the Fourth Amendment. *Id.,* ¶¶ 38–52. This court continued on that path in *Eason* by following the United States Supreme Court's evolving interpretation of the Fourth Amendment, but interpreting Article I, Section 11 as requiring some minimal additional assurances before triggering the good faith exception to the exclusionary rule. *Id.,* ¶¶ 60–63.

¶ 38. We find no reason in this case to depart from our customary practice of interpreting Article I, Section 11 in accord with the Fourth Amendment. As such, we adopt the *Harris* exception to the exclusionary rule because we are persuaded by the United States Supreme Court's well-reasoned decision.[28]

¶ 39. The *Harris* rule appropriately balances the purposes of the exclusionary rule and the *Payton* rule with the social costs associated with suppressing evidence. The *Payton* rule was premised on the Fourth Amendment's protection of the "sanctity of the home." *Payton,* 445 U.S. at 588–89, 601; *Harris,* 495 U.S. at 17. The purposes of the exclusionary rule are to deter police misconduct and ensure judicial integrity by refusing to rely on evidence obtained through police misconduct, *Eason,* 245 Wis. 2d 206, ¶ 44, but the primary purpose is deterrence, *Knapp,* 285 Wis. 2d 86, ¶ 22. The laudable goal of deterring police misconduct is not pursued

---

[28] As the court of appeals noted, it has applied the *Harris* rule in a number of cases. *Felix,* No. 2010AP346–CR, ¶ 14 n.5. For example, the court of appeals discussed and applied *Harris* in *State v. Roberson,* 2005 WI App 195, ¶¶ 16–23, 287 Wis. 2d 403, 704 N.W.2d 302, which this court affirmed on other grounds, 2006 WI 80, 292 Wis. 2d 280, 717 N.W.2d 111.

at all costs. As this court noted in its analysis of the good faith exception to the exclusionary rule, there are "substantial social costs" associated with excluding relevant evidence. *Eason,* 245 Wis. 2d 206, ¶ 31.

¶ 40. The United States Supreme Court reiterated in *Harris* that "[t]he penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." 495 U.S. at 17. The *Harris* rule is based on the Supreme Court's conclusion that suppressing evidence and statements obtained from a defendant outside of the home following a *Payton* violation does not further the purpose of the *Payton* rule: "the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.* The *Payton* rule is vindicated through the suppression of any evidence or statements obtained from the defendant while officers are still inside the defendant's home unlawfully. *Id.* at 20. The Fourth Amendment does not require courts to exclude all evidence or forgo prosecuting a defendant following unlawful police conduct, even if doing so might have *some* deterrent effect. *Id.* Under the *Harris* rule, police are sufficiently deterred from violating *Payton* because "the principle incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home." *Id.* There is no compelling reason to go further and suppress evidence lawfully obtained from a defendant outside of the home.

¶ 41. The *Harris* Court drew a line at the entrance to the home because that is the heart of the

Fourth Amendment and the focus of *Payton*. *Id.* at 17–18. *Harris* provides a narrow rule: where police had probable cause before the unlawful entry and arrest, an arrest in violation of *Payton* does not require the suppression of evidence obtained from the defendant outside of the home, such as statements obtained after *Miranda* warnings and the waiver of those rights. For this narrow category of evidence, it is not necessary to do a *Brown* analysis where it is clear as it is here that the evidence is not derived from the illegality. *See id.* at 19–20. In other situations, this court and the United States Supreme Court continue to require a *Brown* analysis to ensure that evidence or statements obtained following police misconduct are not the product of the illegality. Additionally, as the Supreme Court noted in *Harris*, evidence will still be suppressed if it was "the product of coercion, if *Miranda* warnings were not given, or if there was a violation of the rule of *Edwards v. Arizona*, 451 U.S. 477 (1981)." *Id.* at 20. The *Harris* rule is a common-sense limitation on the exclusionary rule where excluding statements and evidence does not serve the deterrent purpose of the exclusionary rule or the purpose of the *Payton* rule.

¶ 42.   While this court's decisions in *Smith* and *Walker*, which preceded *Harris*, applied a *Brown* attenuation analysis to determine the admissibility of evidence that is covered by the *Harris* rule, we follow the United States Supreme Court's evolving interpretation of the Fourth Amendment.[29] In accord with *Harris*,

[29] Felix argues that our decision in *Laasch*, 84 Wis. 2d 587, also conflicts with the *Harris* rule, but we disagree. *Laasch* did not involve a *Brown* analysis or even the suppression of evidence. In *Laasch*, this court held that the circuit court lacked

we hold that where police had probable cause to arrest before the unlawful entry and warrantless arrest from a defendant's home, this violation of *Payton* does not require the suppression of evidence obtained from a defendant outside of the home, such as statements obtained after the defendant was given and waived his *Miranda* rights.

¶ 43. This holding does not conflict with this court's post-*Harris* decisions in *Anderson,* 165 Wis. 2d 441, and *Phillips,* 218 Wis. 2d 180, contrary to Felix's assertions. We applied a *Brown* attenuation analysis in those cases because they involved the fruits of an unlawful entry and search. *Anderson,* 165 Wis. 2d 441 (involving the suppression of physical evidence obtained from a consent search of Anderson's home where, following unlawful searches by police, Anderson was lawfully arrested in his home pursuant to an arrest warrant and later confessed and consented to a search of his home); *Phillips,* 218 Wis. 2d 180 (involving the suppression of evidence obtained following a search of Phillips' bedroom where police obtained Phillips' consent while unlawfully inside of his home). As stated above, the *Harris* rule applies where the only illegal police conduct is an unlawful entry and arrest in violation of *Payton,* not where the evidence may be tied to an unlawful search by police. Contrary to the court of appeals' conclusion and Felix's argument, it is not "peculiar" to limit the application of the *Harris* rule to cases where the only illegal police conduct is a *Payton* violation. Rather it is logical to develop a limited,

personal jurisdiction over Laasch as a result of the unlawful entry and arrest. *Id.* at 597. This part of *Laasch*'s holding was later modified by *State v. Smith,* 131 Wis. 2d 220, 240, 388 N.W.2d 601 (1986) (holding that an unlawful arrest does not deprive a circuit court of personal jurisdiction).

bright-line rule for a narrow category of evidence obtained after an unlawful arrest in violation of *Payton,* but where police had probable cause to arrest, that we can say as a matter of law does not "bear a sufficiently close relationship to the underlying illegality." *See Harris,* 495 U.S. at 19.

¶ 44. We now apply the *Harris* rule to determine whether there should be suppression of Felix's written, signed statement at the police station, the buccal swab provided at the police station, and his clothing seized at the jail. As we stated above, the *Harris* rule applies because police had probable cause to arrest Felix prior to going to his apartment, and consistent with the position of the parties, we assume, without deciding, that police unlawfully arrested Felix at his home without an arrest warrant in violation of *Payton. See supra* ¶¶ 28–29.

¶ 45. Felix's signed statement at the police station, after he was given and waived his *Miranda* rights,[30] falls squarely under *Harris*'s holding that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton." Harris,* 495 U.S. at 21. Felix does not argue that his statement or the buccal swab he provided at the police station must be suppressed under *Harris* but rather that the attenuation analysis of *Brown* must be applied. Like

[30] As we noted above, Felix challenged the voluntariness of his statement and the validity of his *Miranda* waiver before the circuit court and court of appeals, but because he does make those arguments before this court, we do not address them. *See supra* note 19.

Felix's written, signed statement at the police station after he was given and waived his *Miranda* rights, the buccal swab is admissible under the *Harris* rule, because it was obtained from Felix while he was lawfully in police custody at the police station.

¶ 46. Felix's clothing that police seized at the jail is also admissible under a logical extension of the *Harris* rule. Felix argues that the *Harris* rule does not cover the clothes he was wearing when he was arrested, and that they must be suppressed as the fruit of his unlawful arrest. Felix argues that the warrantless arrest led directly to the seizure of his clothing because if the police had taken the time to get a warrant, he would have changed and police would not have obtained his clothing. This argument is based on the type of but-for causality that the United States Supreme Court rejected in *Hudson v. Michigan,* 547 U.S. 586 (2006). The reasoning in *Hudson* informs our interpretation of the *Harris* rule, and supports applying it to the seizure of Felix's clothes at the jail.

¶ 47. In *Hudson,* the Court explained that "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Id.* at 592. After highlighting the "substantial social costs" of the exclusionary rule, "which sometimes include setting the guilty free and the dangerous at large," the Supreme Court reiterated that "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Id.* at 591–92 (quoting *United States v. Leon,* 468 U.S. 897, 906 (1984)) (internal quotations omitted). The *Hudson* Court declined to

apply the exclusionary rule for a violation of the knock-and-announce rule, because the minimal deterrent effect was far outweighed by the social costs of suppressing the evidence. *Id.* at 599.

¶ 48.  When we examine *Harris* in this light, it is clear that the *Harris* Court drew a line at the entrance to the home and concluded that there was sufficient deterrence for *Payton* violations by suppressing evidence and statements that police obtained while unlawfully inside of the home and admitting evidence police lawfully obtained outside of the home. *Harris,* 495 U.S. at 17–20. Thus, we interpret *Harris* to apply to statements and evidence that police obtain from the defendant outside of the home. Under our interpretation of *Harris,* Felix's clothing that police seized at the jail when he was being booked is admissible. This interpretation is supported by the language and rationale we have noted in *Harris* and *Hudson.* We also note that several other states have interpreted *Harris* in this way.[31]

¶ 49.  Additionally, Felix's clothing was not taken as evidence until after Felix was lawfully in police custody and was given and waived his *Miranda* rights.

---

[31] *People v. Alexander,* 571 N.E.2d 1075, 1084 (Ill. App. Ct. 1991) ("While *Harris* refers only to 'statements,' we see no reason why the rule it enunciates should not apply as well to other evidence obtained outside the home, as the argument for excluding statements was that they were the 'fruits of an illegal arrest' rather than that there was some basis for distinguishing between statements and other evidence."); *People v. Watkins,* 31 Cal. Rptr. 2d 452, 459 n.8 (Cal. Ct. App. 1994) ("Since the arrest itself is proper, physical evidence taken from the defendant's person at the police station need not be suppressed."); *Timmons v. State,* 734 N.E.2d 1084, 1086 (Ind. Ct. App. 2000) (concluding that the *Harris* rule applies to both statements and tangible physical evidence).

The police did not even develop a reason to seize Felix's clothing until the detective noticed some "red spots" on Felix's shirt during questioning at the police station. That fact distinguishes this case from *Tyree,* 919 N.E.2d at 682, in which the Massachusetts Supreme Judicial Court held that *Harris* did not apply to the shoes the defendant was wearing when unlawfully arrested in his home. In *Tyree,* police noticed that the defendant's shoes matched the shoeprints at the scene of the crime while they were still unlawfully in his home. *Id.* at 668. The Massachusetts Supreme Judicial Court found it significant that police noted "the potential evidentiary relevance of a piece of a suspect's clothing while they [were] still unlawfully in the home." *Id.* at 682. As we explained above, the Supreme Court's reasoning in *Hudson* supports our reading of the *Harris* rule as applicable to physical evidence obtained from the defendant outside of the home, as well as to statements made after the defendant was given and waived his *Miranda* rights. In this case, that includes the clothes Felix was wearing when he was arrested that police seized at the jail.

¶ 50. Therefore, we conclude that, under *Harris,* there is no basis for suppressing Felix's written, signed statement after he was given and waived his *Miranda* rights at the police station, the buccal swab that he provided at the police station, and his clothing that police seized at the jail.

## V. CONCLUSION

¶ 51. We continue our usual practice of interpreting Article I, Section 11 of the Wisconsin Constitution in accord with the United States Supreme Court's interpretation of the Fourth Amendment. Thus, we adopt the *Harris* exception to the exclusionary rule for

certain evidence obtained after a *Payton* violation. We hold that, where police had probable cause to arrest before the unlawful entry, a warrantless arrest from Felix's home in violation of *Payton* requires neither the suppression of statements outside of the home after *Miranda* rights were given and waived, nor the suppression of physical evidence obtained from Felix outside of the home. Assuming without deciding that Felix's warrantless arrest from his home was in violation of *Payton,* we conclude that, pursuant to the *Harris* rule, the following evidence that police obtained outside of the home is admissible: Felix's signed statement, made after Felix was given and waived his *Miranda* rights, the buccal swab obtained at the police station, and Felix's clothing seized at the jail, as well as any derivative evidence.

¶ 52.    Therefore, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 53. DAVID T. PROSSER, J. (*concurring*). In *Payton v. New York,* 445 U.S. 573, 576 (1980), the United States Supreme Court held that "the Fourth Amendment to the United States Constitution . . . prohibits the police from making a warrantless and nonconsensual *entry into a suspect's home* in order to make a routine felony arrest." (Emphasis added.) The Court added that it had "no occasion to consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless *entry into a home* for the purpose of either arrest or search." *Id.* at 583 (emphasis added).

¶ 54. The majority opinion in this case is based on the assumption that police officers from the Everest Metro and Wausau police departments violated the rule in *Payton* when they arrested Devin Felix (Felix) at the apartment of Dean Kudick in Wausau. Because I do not agree with this assumption, I write separately to explain my position—even though I join the majority opinion.

## FACTUAL BACKGROUND

¶ 55. On September 8, 2007, officers of the Everest Metro Police Department were called to a Schofield, Wisconsin residence at about 1:10 a.m. There had been a serious fight at an underage drinking party, and when officers arrived at the residence they found a man lying in the street with multiple stab wounds and a shirt soaked with blood. The victim, Nathaniel Davids, 18, died soon after he was rushed to a local hospital.

¶ 56. The fight was observed by partygoers and neighbors but after the stabbing, many of them quickly fled the scene. Police immediately determined that they had a potential homicide on their hands. They began to gather information and called in other Everest Metro officers, including Detective Sergeant Dennis Halkoski, who became the lead investigator, and Officer Daniel Goff, both of whom had been at home. Eventually, when suspicion focused on Devin Felix, the Everest Metro police also brought in Wausau officers because Felix was thought to be living in Wausau. The involvement of Wausau police was not only helpful but also necessary to avoid any jurisdictional issues in the event of an arrest.

¶ 57. The record describes how Detective Sergeant Halkoski interviewed various witnesses beginning about 3:00 a.m. and continuing until after 7:00

a.m. Other officers, including Sergeant Terrence Peterson, also conducted interviews. At some point, Officer Goff and an Everest Metro captain left Schofield to drive to Wausau where they met up with Wausau Officer Mark Klein. The two Everest Metro officers arrived at approximately 7:00 a.m.

¶ 58. The three officers were looking for Felix, his brother Kylie, and the green Chrysler that Felix purportedly used to escape. They first went to an address on East Wausau Avenue where they expected to find Kylie, who had been at the party and may have left with his brother. The officers found nothing, as no one appeared to be living at that address.

¶ 59. The officers next went to an address on Prospect Avenue where Keith Felix, the boys' father, was living. They found him, interviewed him, and then followed his suggestion to look for Felix at 617 Fulton Street, a two-story building where Felix was supposed to be living in the basement.

¶ 60. At approximately 8:00 a.m. officers began to gather at the Fulton Street address. A green Chrysler registered to Felix's mother was spotted in the driveway. Detective Sergeant Halkoski was notified to come from Schofield, and additional back-up officers were enlisted from Wausau.

¶ 61. After eight officers had arrived and created a secure perimeter around the house, Detective Sergeant Halkoski and Officer Goff approached the entrance to the basement at the rear of the house with their guns drawn.

¶ 62. Halkoski knocked hard on the back door which popped open. The officers saw Felix apparently sleeping in a recliner, five to six feet from an open doorway at the bottom of the steps to the basement. The officers ordered Felix to put up his hands and come

out, which he did. He was placed under arrest, handcuffed, and put in a squad car. The police did not have an arrest warrant for Felix.

## ANALYSIS

¶ 63. In analyzing the facts to determine whether there was a *Payton* violation, both the majority opinion and the court record require close scrutiny.

¶ 64. First, there is no dispute that police officers had probable cause to arrest Devin Felix for the murder of Nathaniel Davids. The police had more statements than those described in the majority opinion, and they had a motive: that Nate Davids was beating up Felix's younger brother Kylie when Felix intervened.

¶ 65. Second, Everest Metro police obtained a search warrant for the Schofield party residence at 5:44 a.m. from Marathon County Circuit Judge Gregory Grau. This search warrant named a "suspect," Devin Felix, and relied for its probable cause on statements made by some of the same witnesses who provided the basis for Felix's arrest. The warrant was prepared by a Marathon County assistant district attorney who came to Schofield in the early hours of September 8.

¶ 66. Third, Everest Metro and Wausau police officers actively, continuously, searched for Devin Felix after he became the focus of the investigation. Felix was an armed homicide suspect who fled the crime scene, was overheard saying he had killed someone, and reportedly vowed he would not go to prison. To find this suspect, police pursued every lead. When they arrived at the Fulton Street address, they did not know how many people were there and whether any persons in the house would be in danger or possibly taken hostage.

¶ 67. Fourth, there is no dispute that when Detective Sergeant Halkoski firmly knocked on the back door

at 617 Fulton Street, it "popped open" ("I knocked at the door and the door popped open."). This testimony was supported by Officer Goff:

Q. And he knocked on the door and what happened?

A. The thing opened.

Q. Okay. The thing being the door?

A. Yes, the door opened. It just swung open when he knocked on it.

¶ 68. Dean Kudick, who had rented the first floor and basement for nearly four years, testified that the back door popped open regularly:

Q. And when someone knocks on the back door, does the door stay closed all the time?

A. I'm not sure what you mean by that.

Q. Okay. If you knock on the door, will it pop open?

A. It is possible it could pop open. It still does to this day.

Q. So it had in the past?

A. Yes, it had.

. . . .

Q. So it doesn't take much pressure then . . .

A. No.

¶ 69. Fifth, neither Detective Sergeant Halkoski nor Officer Goff *entered the house* to effect the arrest. Halkoski was asked:

Q. Did you cross the threshold or enter the house?

A. No.

¶ 70.   On cross examination, Halkoski was asked whether his gun was beyond the doorjamb as he was covering Felix. He responded that it was.

Q. Outside or inside?

A. Outside.

Consequently, there is no evidence that the officers ever broke the plane of the threshold before or during the arrest.

¶ 71.   Several officers did enter the house *after* Felix had been arrested, for a sweep of the premises for officer safety. The officers explained that they did not know the whereabouts of Kylie Felix and they detected movement on the back porch where Kylie and another brother usually slept. The officers did not conduct a search for evidence until they received written consent from the lessee of the apartment.

¶ 72.   In sum, the police acted conscientiously, and there was no violation of *Payton* unless the rule in *Payton* is extended to cover a "constructive entry" *and* the existence of exigent circumstances is ruled out. Such a conclusion would require a change in Wisconsin law.

¶ 73.   In his trial brief supporting his motion to suppress evidence, Felix contended that his warrantless arrest "from inside the home and at gunpoint" violated the federal and state constitutions. He cited *Payton* and *Laasch v. State,* 84 Wis. 2d 587, 267 N.W.2d 278 (1978). However, the brief went on:

> The *Payton* case did emphasize the sanctity of the home and made reference to the threshold as being one

point of significance. However, subsequent federal cases have had the opportunity to examine the circumstances by which the defendant's presence was acquired, outside and across the threshold. It has been uniformly held that a warrantless arrest will be illegal if the defendant's presence outside was acquired by coercion. *See* [LaFave], *Search and Seizure* at section 6.1, note 188.

Wisconsin has no reported case directly on point. However, several circuits of the U.S. Court of Appeals have examined this issue. The universal conclusion is that the 4th Amendment could be too easily circumvented if law enforcement is allowed to simply point a gun at a home and order the occupants out, in order to achieve a valid warrantless arrest. The requirement of a judicially-reviewed warrant is so fundamental that this can not be tolerated.

. . . .

It is clear that while the [officers] physically remained outside the doorway, the reach of the officers extended into the residence by the use of firearms and by the use of commands to exit.

¶ 74.   The *LaFave* treatise cited by the defendant reads in part:

The cases involving arrests made on the premises (in the broad sense of that term) *outside* rather than inside the threshold deserve some attention at this point, for quite similar considerations govern there. . . . [T]he warrantless arrest will be illegal if the defendant's presence outside was acquired by coercion.

Wayne R. LaFave, *Search and Seizure,* Basis For Entry to Arrest § 6.1 at 306–07 (4th ed. 2004).

¶ 75.   This theory of "constructive entry" merits careful examination in light of the actual facts and language of the *Payton* decision.

¶ 76. *Payton v. New York* was decided in 1980, with a majority opinion written by Justice John Paul Stevens. *Payton,* 445 U.S. at 573, 574. Over and over the opinion emphasizes warrantless *physical entry* of a private residence. For example:

> As the Court reiterated just a few years ago, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313. . . . [T]he warrant procedure minimizes the danger of needless intrusions of that sort.

*Payton,* 445 U.S. at 585–86.

> Judge Leventhal [in *Dorman v. United States,* 435 F.2d 385, 389 (D.C. Cir. 1970)] first noted the settled rule that warrantless arrests in public places are valid. He immediately recognized, however, that . . .
>
> "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."
>
> . . . .
>
> Judge Leventhal concluded that an *entry* to arrest and an *entry* to search for and seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection.

*Id.* at 587–88 (emphasis added).

> [A]ny differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: *the breach of the entrance to an individual's home.* . . . [Nowhere] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home.

*Id.* at 589 (emphasis added).

710

[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Id.* at 590.

¶ 77. The dissent of Justice Byron White also emphasized entry: "The Court today holds that absent exigent circumstances officers may never *enter a home* during the daytime to arrest for a dangerous felony unless they have first obtained a warrant." *Id.* at 603 (White, J., dissenting) (emphasis added). "Today's decision rests, in large measure, on the premise that warrantless arrest *entries* constitute a particularly severe invasion of personal privacy." *Id.* at 615 (emphasis added).

¶ 78. The facts in *Payton* are fully aligned with these statements. Police used crowbars to break open the door and enter Payton's apartment. *Id.* at 576 (majority opinion). "They had not obtained a warrant." *Id.* When police went to Obie Riddick's home (in the companion case), "his young son opened the door." *Id.* at 578. Police "entered the house and placed [Riddick] under arrest." *Id.* They made an arrest and conducted a search without a warrant. *Id.*

¶ 79. The Court cited ten state court decisions, including *Laasch,* to support its opinion. *Id.* at 575 n.3.[1] In all these cases, police entered a house or apartment

---

[1] *See State v. Cook,* 564 P.2d 877 (Ariz. 1977); *People v. Ramey,* 545 P.2d 1333 (Cal. 1976); *People v. Moreno,* 491 P.2d 575 (Colo. 1971); *State v. Jones,* 274 N.W.2d 273 (Iowa 1979); *State v. Platten,* 594 P.2d 201 (Kan. 1979); *Commonwealth v. Forde,* 329 N.E.2d 717 (Mass. 1975); *State v. Olson,* 598 P.2d 670 (Or. 1979); *Commonwealth v. Williams,* 396 A.2d 1177 (Pa. 1978); *State v. McNeal,* 251 S.E.2d 484 (W. Va. 1978); *Laasch v. State,* 84 Wis. 2d 587, 267 N.W.2d 278 (1978).

without a warrant, sometimes forcing open or kicking down the door. *Laasch* provides a representative example. "[T]he defendant was arrested in her apartment, without a warrant." *Laasch,* 84 Wis. 2d at 588. Thereafter, she was released. Thirteen days later, when she returned home, she found "police officers waiting inside her apartment," having been admitted by her five-year-old son. *Id.* at 589. She was arrested, inside the apartment, without a warrant. *Id.* The court quoted the Supreme Court's decision in *Johnson v. United States,* 333 U.S. 10, 14 (1948), that "The right of officers to thrust themselves into a home is . . . a grave concern." *Laasch,* 84 Wis. 2d at 594. Then it concluded:

> In the absence of exigent circumstances . . . the entry of one's dwelling to effect an arrest is subject to a warrant requirement no less exacting than that applicable where the entry is made to effect a search for one's papers and effects.
>
> . . . .
>
> We conclude that, absent exigent circumstances, the entry of one's dwelling without consent to effect a warrantless felony arrest on probable cause, is unlawful.

*Id.* at 595–96 (footnote omitted).

¶ 80. The *Payton* Court also cited six United States Court of Appeals cases supporting its decision. *Payton,* 445 U.S. at 575 n.4.[2] Each of these cases also involved actual entry into private residential property without a warrant.

---

[2] *See United States v. Houle,* 603 F.2d 1297 (8th Cir. 1979); *United States v. Reed,* 572 F.2d 412 (2d Cir. 1978); *United States v. Prescott,* 581 F.2d 1343 (9th Cir. 1978); *United States v. Killebrew,* 560 F.2d 729 (6th Cir. 1977); *United States v. Shye,* 492 F.2d 886 (6th Cir. 1974); *Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970).

¶ 81. The *Payton* decision stands out as one in which the dueling majority and dissenting opinions devote considerable effort buttressing their positions by reference to English common law preceding the adoption of the Fourth Amendment. Justice Stevens relied heavily on Lord Edward Coke who wrote that "[N]either the Constable, nor any other can break open any house for the apprehension of the party suspected or charged with the felony. . . ." *Id.* at 594 n.37 (quoting 4 E. Coke, Institutes 177). William Blackstone and other commentators had different views. However, none of the opinion writers in *Payton* cited common law authority for "constructive entry." Indeed, if "constructive entry" had been at issue, the result in *Payton* might have been different.

¶ 82. *Payton* has been narrowly interpreted by the Supreme Court since 1980. "[T]he rule in *Payton* was designed to protect the physical integrity of the home." *New York v. Harris,* 495 U.S. 14, 17 (1990). "*Payton* itself emphasized that our holding in that case stemmed from the 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' " *Id.* (quoting *Payton,* 445 U.S. at 601).

¶ 83. In *Minnesota v. Olson,* 495 U.S. 91, 95 (1990), the Court said: "The purpose of the [*Payton*] decision was not to protect the person of the suspect but to protect his home from entry in the absence of a magistrate's finding of probable cause."

¶ 84. As will be explained, "constructive entry" to effect an arrest—that is, treating police conduct *outside* the home the same as police conduct *inside* the home when police have broken a plane or crossed the threshold of the home to make an arrest without a warrant—is not based on the common law that existed

when the Fourth Amendment was adopted. It is grounded on a very different theory than the theory articulated in *Payton*.

¶ 85. The Fourth Amendment reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

¶ 86. By its plain terms, the Fourth Amendment governs searches and seizures, including seizures of the person, i.e., arrests. In *United States v. Watson,* 423 U.S. 411 (1976), the Supreme Court held that a police officer may, *without warrant,* arrest a person who is believed by the officer, upon probable cause, to be guilty of a felony. *Id.* at 415–17. *Payton* placed a geographic limitation on this power to arrest. It identified a place—the suspect's home—where probable cause, no matter how compelling, is not sufficient to make an arrest without a warrant, except in exigent circumstances. Absent exigent circumstances, police are required to have a warrant or consent before they may enter a suspect's home to make an arrest.

¶ 87. Analytically, an arrest warrant may confirm police power to make an arrest, but it does not create it. With probable cause, the police already have that power. If the police come to a suspect's home with probable cause but no warrant, they may surround the house and stay there until they get a warrant. They do not have to absent themselves from the area until they get a warrant. They may arrest their suspect as he

comes to the house, and they may arrest him if he attempts to leave the house. The police know and the suspect knows that he is not free to go somewhere else simply because the police do not have a warrant. If he leaves, he will be arrested.

¶ 88. The warrant, then, serves as a judicially-approved ticket to enter the house to arrest or search.

¶ 89. When the purpose of the warrant is to facilitate an arrest, the warrant is not really protecting a suspect's privacy so much as it is protecting the sanctity of the home. *See* ¶ 31, *supra.* The sanctity of the home, in turn, must yield when the suspect creates exigent circumstances.

¶ 90. This analysis is grounded in the law of trespass, as perfectly illustrated in *Silverman v. United States,* 365 U.S. 505 (1961). Defendants were convicted at trial based on conversations "overheard by means of an electronic listening device." *Id.* at 506.

> The instrument in question was a microphone with a spike about a foot long attached to it, together with an amplifier, a power pack, and earphones. *The officers inserted the spike* under a baseboard in a second-floor room of the vacant house and *into a crevice extending several inches into the party wall, until the spike hit something solid "that acted as a very good sounding board."* The record clearly indicates that the spike made contact with a heating duct serving the house occupied by the petitioners, *thus converting their entire heating system into a conductor of sound.* Conversations taking place on both floors of the house were audible to the officers through the earphones, and their testimony regarding these conversations, admitted at the trial over timely objection, played a substantial part in the petitioners' convictions.

*Id.* at 506–07 (emphasis added).

¶ 91. The Supreme Court declared that "Eavesdropping accomplished by means of such a physical intrusion is beyond the pale of even those decisions in which a closely divided Court has held that eavesdropping accomplished by other electronic means did not amount to an invasion of Fourth Amendment rights." *Id.* at 509–10. The Court observed that in *On Lee v. United States,* 343 U.S. 747 (1952)—in contrast to *Silverman*—"no trespass was committed." *Silverman,* 365 U.S. at 510 (quoting *On Lee,* 343 U.S. at 751) (internal quotation marks omitted).[3] It added that the "absence of a physical invasion of the petitioner's premises" was a "vital factor" in *Olmstead v. United States,* 277 U.S. 438 (1928). *Silverman,* 365 U.S. at 510. But in *Silverman,* "the officers overheard the petitioners' conversations only by usurping part of the petitioners' house or office—a heating system which was an integral part of the premises." *Id.* at 511.

¶ 92. The Court's reliance on trespass and property law in interpreting the Fourth Amendment was suspect when a government search invaded a person's reasonable expectation of privacy but the person had no discernible property interest to serve as an obstacle to the invasion. The dilemma came to a head in *Katz v. United States,* 389 U.S. 347 (1967), where the court suppressed evidence obtained from eavesdropping by means of an electronic listening device attached to a public telephone booth.

¶ 93. Justice Potter Stewart, who was part of the majority in *Payton,* wrote the majority opinion in *Katz,*

---

[3] Even the concurrences by Justice Douglas and Justices Clark and Whittaker recognize the Court making a distinction based solely upon invasion into property. *Silverman v. United States,* 365 U.S. 505, 512–13 (1961).

taking issue at once with the questions posed to the Court:

> A. Whether a public telephone booth is a constitutionally protected area so that evidence obtained by attaching an electronic listening recording device to the top of such a booth is obtained in violation of the right to privacy of the user of the booth.

> B. Whether physical penetration of a constitutionally protected area is necessary before a search and seizure can be said to be violative of the Fourth Amendment to the United States Constitution.

*Katz*, 389 U.S. at 349–50.

¶ 94. The Court rejected this formulation of the issues, making two critical points. First, "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.' " *Id.* at 350. Second, "the Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' " *Id.* The Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion, but its protections . . . often have nothing to do with privacy at all." *Id.* These critical passages are frequently overlooked because of Justice Stewart's oft-quoted aphorism that "the Fourth Amendment protects people, not places," *id.* at 351, and his critique of property interests as the basis for certain Fourth Amendment protections:

> It is true that the absence of . . . penetration was at one time thought to foreclose further Fourth Amendment inquiry for that Amendment was thought to limit only searches and seizures of tangible property. But "[t]he premise that property interests control the right of the Government to search and seize has been discredited."

*Id.* at 352–53 (citations omitted). As a result, many Court decisions link Fourth Amendment violations to individual privacy.

¶ 95. But *Katz* did not consistently send that signal. The Court said:

> [O]nce it is recognized that the Fourth Amendment protects people—*and not simply "areas"*—against unreasonable searches and seizures, it becomes clear that the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure.

*Id.* at 353 (emphasis added). The phrase "not *simply* 'areas' " means that the Fourth Amendment does not apply only in the context of trespass. However, by its explicit terms, the Fourth Amendment does protect some "areas"—e.g., "houses"—and that protection is based largely on trespass law.

¶ 96. In addition, the Court emphasized that *Katz* was a *search* case when it said: "We do not deal in this case with the law of detention or *arrest* under the Fourth Amendment." *Id.* at 353 n.13 (emphasis added).

¶ 97. The Court has moved away from property law in search cases involving sophisticated technology. For instance, in *Kyllo v. United States,* 533 U.S. 27, 34 (2001), the majority was troubled by technology that permitted the police to "obtain[] by sense-enhancing technology any information regarding the interior of the home," which it described as "the prototypical . . . area of protected privacy." *Id.* at 34. Even though the *Kyllo* Court recognized that the police did not physically enter the home, the Court stressed the importance of protecting the intimate details of the home from what could have been accomplished, at the time of the adoption of the Fourth Amendment, only by physical intrusion into the home. *Id.* at 38–40.

¶ 98. Both the majority opinion, *id.* at 40, and Justice Stevens' dissent, *id.* at 43, focused on protecting the *home* of the defendant. They were concerned that technology, in effect, had permitted the police to enter and search the home without physical intrusion. Hence, the decision did not eliminate the Fourth Amendment's link to property law.

¶ 99. The Court recently reiterated and reemphasized this link in a case involving a GPS device placed on an automobile. In *United States v. Jones,* 565 U.S. ___, 132 S. Ct. 945 (2012), the Court was accused of resolving a case involving "a 21st-century surveillance technique" by resorting to "18th-century tort law" involving trespass to chattels. *Id.* at 957 (Alito, J. concurring). But the majority author, Justice Antonin Scalia, was unapologetic:

> The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted. . . .
>
> The text of the Fourth Amendment reflects its close connection to property.
>
> . . . .
>
> [O]ur Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century.
>
> . . . .
>
> [F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. *Katz* did not repudiate that understanding.

*Id.* at 949–50 (majority opinion) (footnote omitted).

¶ 100. In her concurrence, Justice Sonia Sotomayor observed that "*Katz*'s reasonable-expectation-of-privacy test augmented, but did not displace or diminish, the common-law trespassory test that preceded it." *Id.* at 955.

¶ 101. In an informative article in the New England Law Review, Professor Steven B. Dow makes a case for constructive entry as a constitutional doctrine. Steven B. Dow, "*Step Outside, Please*": *Warrantless Doorway Arrests and the Problem of Constructive Entry*, 45 New Eng. L. Rev. 7 (2010). Part of his argument reads as follows:

> At one point the Court's "Fourth Amendment jurisprudence was tied to common-law trespass," but for more than half a century the Court has made it clear that "[i]nherent Fourth Amendment rights are not inevitably measurable in terms of ancient niceties of tort or real property law." More recently, the Court has expressly "decoupled violation of a person's Fourth Amendment rights from trespassory violation of his property." Any lingering doubts about whether Fourth Amendment privacy rights stop at the physical line that marks a home's boundaries should have come to an end with the Court's 2001 decision in *Kyllo v. United States*.

*Id.* at 19 (footnotes omitted).

¶ 102. Contrary to Professor Dow's analysis, the Supreme Court's opinion in *Jones* unquestionably affirms the Court's continuing recognition of the Fourth Amendment's roots in property law and the Court's willingness to adhere to a property rationale except in searches involving sophisticated technology. The Supreme Court has not adopted a constructive entry doctrine in cases of arrest.

¶ 103. If the Court were to treat arrests *outside* the home the same as arrests *inside* the home after police entry without a warrant, the Court would be

creating law inconsistent with *Harris* as well as *Payton*. *Harris* permits police to obtain voluntary confessions from suspects off premises after an arrest is made in the home in violation of *Payton*. Unless *Harris* were repudiated, adoption of the doctrine of constructive entry in *arrest* cases would incentivize police to enter houses without a warrant because, by doing so, they would be able to seize their suspects in the home, be able to prosecute them even after unlawful arrests (if they had probable cause to arrest), and still retain the possibility of obtaining voluntary confessions from these suspects off premises after giving them *Miranda* warnings.

¶ 104. Constructive entry to effect an arrest is not grounded in the English common law. It represents a departure from the established bright line rule against breaking a plane to physically enter a protected premises, and it would, if adopted, create uncertainty in the law about what police conduct *outside* the home is so "coercive" or "deceptive" to a suspect inside the home that it compels or induces the suspect to come out and surrender and thus requires some sort of suppression of evidence. To deter "constructive entry" in arrest cases in which the police have probable cause to arrest, the law might have to suppress more than subsequent confessions and physical evidence. It might have to bar prosecution of persons seized "unlawfully" both inside and outside the home. This would inevitably lead to an expansion of exigent circumstances authorizing entry without a warrant.[4]

¶ 105. The court assumes a *Payton* violation for its analysis in this case. While this assumption is understandable given how the case evolved, it is nonetheless somewhat troubling because the court adopts

---

[4] A persuasive argument can be made for exigent circumstances in this case.

and follows *Harris* under the Wisconsin Constitution. *Harris* is simply inconsistent with the notion of a *Payton* "violation" on the facts of this case where there was no physical entry into the home. Moreover, the Supreme Court may someday decide that *Harris* does not apply to physical evidence—like bloody clothing—that a suspect brings with him when he comes out of the house. Even though the Supreme Court has repeatedly moved beyond property law and "place" in a search context, it is unlikely to stray from *Payton* principles and property law when it comes to the seizure of a person in the home.

¶ 106. *Payton* was more about places than people. However, focusing on people, surprise and even coercion is sometimes preferable for both suspects and police officers than the violence that may accompany service of a judicially sanctioned warrant.

¶ 107. For the reasons stated, I respectfully concur.

¶ 108. ANN WALSH BRADLEY, J. *(dissenting).* To be clear, contrary to the concurrence's assertions, *Payton v. New York,* 445 U.S. 573 (1980) was violated when officers arrested Felix in his home without a warrant.

¶ 109. The question before this court is not whether there was a violation of *Payton,* as the concurrence suggests. The State has conceded a *Payton* violation at every stage of this case, and during oral argument in this court, it expressly disavowed the argument advanced by the concurrence.[1]

---

[1] The concurrence opines that *Payton* was not violated when the officers, with guns drawn, ordered Felix out of his home where he was placed in handcuffs. It suggests that Felix was arrested "outside the home" because the arresting officers never "broke the plane of the threshold [of Felix's home] before or during the arrest." Concurrence, ¶¶ 103, 70.

¶ 110.   Rather, the question we address is whether we should interpret our state constitution as providing greater protection of our liberty interests than the protection provided by the United States Constitution. The majority answers the question no, embracing the rationale of *New York v. Harris,* 495 U.S. 14 (1990).

¶ 111.   Because I conclude that the *Harris* decision does not sufficiently deter illegal government activity and because that decision may instead create powerful new incentives encouraging illegal arrests, I would accord the people of this state greater protection of their liberty interests under our state constitution. Accordingly, I respectfully dissent.

I

¶ 112.   The majority "find[s] no reason" to interpret the Wisconsin Constitution any differently than the Supreme Court has interpreted the United States

This suggestion is mistaken. The flaw in the concurrence's analysis is that it confuses the legal concept of arrest with the factual, physical act of handcuffing a suspect. "[T]he standard used to determine the moment of arrest is whether a reasonable person in the defendant's position would have considered himself or herself to be in custody, given the degree of restraint under the circumstances." *State v. Kiekhefer,* 212 Wis. 2d 460, 485, 569 N.W.2d 315 (Ct. App. 1997).

The State has conceded that the officers' "constructive entry" of Felix's apartment violated *Payton* (absent exigent circumstances). This concession is on firm footing. *See United States v. Saari,* 272 F.3d 804 (6th Cir. 2001); *Sharrar v. Felsing,* 128 F.3d 810 (3d Cir. 1997); *United States v. Maez,* 872 F.2d 1444 (10th Cir. 1989); *United States v. Curzi,* 867 F.2d 36 (1st Cir. 1989); *United States v. Al-Azzawy,* 784 F.2d 890 (9th Cir. 1985); *Scroggins v. State,* 633 S.W.2d 33 (Ark. 1982); *State v. Dahl,* 915 P.2d 979 (Or. 1996); *see also City of Sheboygan v. Cesar,* 2010 WI App 170, ¶ 13, 330 Wis. 2d 760, 796 N.W.2d 429.

Constitution. Majority op., ¶ 38. It asserts that "the *Harris* Court drew a line at the entrance to the home," and following *Harris,* it declines to suppress the statements made by Felix outside of his home following his warrantless home arrest. *Id.,* ¶ 48.

¶ 113. Although the *Harris* rule pertains only to statements obtained outside the home, the majority goes further. It extends the *Harris* rule to physical evidence obtained outside the home, even though the physical evidence would not have been seized "but for" the illegal entry. *Id.,* ¶¶ 25, 46. Its rationale appears to be grounded in the *Harris* Court's assurances that "there is no compelling reason" to suppress this evidence because suppression would have little deterrent effect. *Id.,* ¶ 40.

## II

¶ 114. Unlike the majority, a unanimous court of appeals declined to apply the *Harris* rule in this case. *State v. Felix,* Case No. 2010AP346–CR, unpublished slip op. (Wis. Ct. App. Mar. 29, 2011). The court of appeals explained that the 5–4 *Harris* decision has been the subject of substantial criticism. *Id.,* ¶ 19 n.9. In particular, it "was the subject of a vigorous dissent" which advanced that the *Harris* majority's "reasoning amounts to nothing more than an analytical sleight of hand, resting on errors in logic, misreadings of our cases, and an apparent blindness to the incentives the Court's ruling creates for knowing and intentional constitutional violation by the police." *Id.* (citing *Harris,* 495 U.S. at 21–22 (Marshall, J., dissenting)).

¶ 115. The *Harris* decision has also been criticized on various grounds by a leading scholar of Fourth Amendment jurisprudence, Professor Wayne LaFave. 6

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(b), at 304 (4th ed. 2004) ("The trouble with [Harris], as the *Harris* dissenters pointed out ... is that ... the detrimental consequences of illegal police action ... do not inevitably cease simultaneously with the illegality itself.").

¶ 116.   Several state courts have criticized the *Harris* decision and have explicitly refused to apply its rationale to their state constitutions. When the Supreme Court remanded *Harris* to New York's highest court, for example, the New York court refused to adopt the Supreme Court's rationale. It explained: "We conclude that the Supreme Court's rule does not adequately protect the search and seizure rights of citizens of New York. Accordingly, we hold that our State Constitution requires that statements obtained from an accused following a *Payton* violation must be suppressed unless the taint resulting from the violation has been attenuated." *People v. Harris*, 570 N.E.2d 1051, 1052–53 (N.Y. 1991).

¶ 117.   Although state courts have split on the question, several states have followed New York's lead. In *State v. Mariano*, 160 P.3d 1258, 1268 (Haw. Ct. App. 2007), the court of appeals of Hawaii stated: "We cannot condone the parsimonious Fourth Amendment protection the Supreme Court doled out in *Harris*." Likewise, the Supreme Court of Connecticut concluded that the *Harris* rule does not provide the protection required by that state's constitution. *State v. Luurtsema*, 811 A.2d 223, 233 (Conn. 2002), overruled on other grounds by *State v. Salamon*, 949 A.2d 1092 (Conn. 2008). *See also State v. Eserjose*, 259 P.3d 172, 178 (Wash. 2011) (concluding that the *Harris* rule "falls short of the protection afforded by our state constitution"). Indeed, we have previously declined to adopt *Harris* in the past,

even though we were given an occasion to do so. *State v. Roberson,* 2006 WI 80, 292 Wis. 2d 280, 717 N.W.2d 111.

¶ 118.   Despite the substantial criticism, the majority today embraces the *Harris* rule and declines to afford greater protection of liberty interests under our state constitution. Both the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution provide that "[t]he right of the people to be secure in their . . . houses . . . shall not be violated." Even if officers have probable cause to arrest a suspect, they are required to secure a warrant before effectuating the arrest at the suspect's home. *Payton,* 445 U.S. 573.[2] The warrant requirement reflects the framers' conviction that the decision to effectuate a home arrest should not be made on the spot by a police officer engaged in the competitive enterprise of ferreting out crime. Rather, the framers provided that the decision should be made by a neutral and detached magistrate. *Id.* at 582, n. 17.

¶ 119.   Absent exigent circumstances, warrantless home arrests are unconstitutional. For years, American courts have suppressed evidence obtained in violation of the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution.[3] One purpose furthered by the exclusionary rule is to deter future constitutional violations by "compel[ling] respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins*

[2] *See also Laasch v. State,* 84 Wis. 2d 587, 595, 267 N.W.2d 278 (1978) (concluding that both the Fourth Amendment and Article I, section 11 of the Wisconsin Constitution require officers to secure a warrant before arresting a suspect in his or her home).

[3] *See, e.g., Weeks v. U.S.,* 232 U.S. 383 (1914); *Hoyer v. State,* 180 Wis. 407, 193 N.W. 89 (1923).

*v. United States,* 364 U.S. 206, 217 (1960).[4] Deterrence through suppression of illegally obtained evidence is necessary to safeguard the constitutional rights of all citizens.[5]

¶ 120. Driven by the purpose of deterring illegal government activity, the United States Supreme Court has recognized the reality that it is often necessary to suppress derivative evidence. This type of evidence is not obtained during the actual illegal search or seizure, but rather, it is the later product of an initial illegal intrusion. Derivative evidence is often referred to as "fruit of the poisonous tree."[6]

---

[4] Another purpose served by the exclusionary rule is the preservation of the integrity of the judicial process. *State v. Hess,* 2010 WI 82, ¶¶ 3, 64–65, 327 Wis. 2d 524, 785 N.W.2d 568.

[5] In *Brinegar v. United States,* 338 U.S. 160 (1949), Justice Jackson cogently explained why suppression of illegally obtained evidence was necessary to safeguard not only the rights of criminal defendants, but also, the rights of the public at large:

> Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

> Courts can protect the innocent against such invasions indirectly and through the medium of excluding evidence obtained against those who frequently are guilty.

*Id.* at 181 (Jackson, J., dissenting).

[6] For the origin of this phrase, see *Nardone v. United States,* 308 U.S. 338, 341 (1939).

¶ 121.   In the landmark case *Brown v. Illinois,* 422 U.S. 590 (1975), the United States Supreme Court acknowledged that not all derivative evidence must be suppressed to fulfill the deterrent purpose of the exclusionary rule. Some derivative evidence may be so attenuated from the underlying illegal conduct that "the deterrent effect of the exclusionary rule no longer justifies its cost." *Id.* at 609 (Powell, J., concurring in part). Nevertheless, the Court indicated that persistent refusal to suppress fruits of the poisonous tree would "substantially dilute[]" the "effect of the exclusionary rule."[7] *Id.* at 602.

¶ 122.   The United States Supreme Court has repeatedly rejected per se rules which would provide that suppression of certain categories of derivative evidence is no longer justified by the cost of deterrence.[8] Rather, when deciding whether derivative evidence must be suppressed, a court must make a determination "on the facts of each case" and guided by three factors set forth in *Brown:* the temporal proximity of the arrest and the confession, the presence of intervening circumstances,

[7] *Brown v. Illinois,* 422 U.S. 590, 602–03 (1975) ("Arrests made without warrant or probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expendent of giving Miranda warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' ").

[8] *See, e.g., Brown,* 422 U.S. at 603 ("While we therefore reject the per se rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative per se or 'but for' rule."); *see also Wong Sun v. United States,* 371 U.S. 471, 487 (1963); *United States v. Leon,* 468 U.S. 897, 911 (1984).

and the purpose and flagrancy of the official misconduct. *Id.* at 603–04.

¶ 123. *Harris* marked a significant departure from this line of cases. The *Harris* opinion gave a nod toward the "familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *Harris,* 495 U.S. at 17. However, the Court proceeded to abandon that "familiar proposition" altogether when it came to statements procured outside the threshold of the home following an illegal warrantless home arrest.

¶ 124. Instead of applying the familiar attenuation test, the *Harris* Court adopted the following categorical rule: Statements obtained outside the home following a warrantless arrest are not "the product of illegal governmental activity." *Id.* at 19. Accordingly, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by a defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton.*" *Id.* at 21. The *Harris* Court's per se rule is a startling departure from *Brown*'s attenuation analysis. *See* LaFave, *Search & Seizure* § 11.4(b), at 304.

¶ 125. As justification for its new rule, the *Harris* Court declared that its holding would not lead to any significant reduction in deterrence: "[T]he principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris', moreover, the incremental deterrent value would be minimal." 495 U.S. at 20.

¶ 126. As the dissent in *Harris* quipped, "The Court's saying it may make it law [for purposes of the Fourth Amendment], but it does not make it true." *Id.* at 29 (Marshall, J., dissenting). Indeed, the *Harris* Court's declaration that deterrence would not be diminished is belied by the facts underlying that case.[9]

¶ 127. The following example, proffered by the dissent, illustrates how officers have much to gain and little to lose when they illegally perform a warrantless home arrest in the wake of *Harris:*

> [T]he officer knows that if he breaks into the house without a warrant and drags the suspect outside, the suspect, shaken by the enormous invasion of privacy he has just undergone, may say something incriminating. . . . [T]he officer envisions the following best-case scenario if he chooses to violate the Constitution [by making a warrantless home arrest in violation of *Payton*]: He avoids a major expenditure of time and effort, ensures that the suspect will not escape, and procures the most damaging evidence of all, a confession. His worst-case scenario is that he will avoid a major expenditure of effort, ensure that the suspect will not escape, and will see evidence in the house (which would have remained unknown absent the constitutional violation) that cannot be used in the prosecution's case in chief.

*Id.* at 32. Ultimately, the dissent persuasively argued that rather than deterring illegal government conduct,

---

[9] In *Harris,* the state court concluded that the police department had a policy of knowingly and intentionally violating *Payton,* and that the policy was "a device used to avoid restrictions on questioning a suspect until the police had strengthened their case with a confession." *People v. Harris,* 72 N.Y. 2d 614, 622 (1988). Under these circumstances, there can be no doubt that the suppression of confessions obtained following *Payton* violations would help deter the department's policy of knowingly and intentionally violating *Payton.*

the *Harris* majority actually "create[d] powerful incentives for police officers to violate the Fourth Amendment." *Id.*

### III

¶ 128.   I agree with the *Harris* dissenters that "[a] regime that suppresses only *some* fruits of constitutional violations" does not go far enough to "eliminate the incentives to violate the Constitution." *Id.* at 23. I find the *Harris* dissent's clear explanation of the necessity of continuing to apply *Brown* much more persuasive than the rationale for abandoning *Brown* proffered by the *Harris* majority.

¶ 129.   In the wake of *Harris,* I fail to see how the exclusionary rule serves its purpose as an effective deterrent of warrantless home arrests. An officer familiar with *Payton* and *Harris,* but wishing to avoid the hassle of securing an arrest warrant, has little incentive to do so. Rather, the officer need only usher the suspect out of the house as quickly as possible so that anything the suspect accidentally blurts out will be admissible under *Harris*'s categorical rule.

¶ 130.   *Harris*'s limitation on the exclusionary rule may be the law of the land with regard to the Fourth Amendment of the United States Constitution. But that fact does not compel this court to similarly engraft this limitation of our liberty onto Article I, Section 11 of the Wisconsin Constitution.

¶ 131.   If we declined to adopt the *Harris* rationale, it would not be the first time we interpreted Article I, Section 11 of our state constitution to provide greater protection of liberty interests than are provided by the United States Supreme Court's existing interpretation of the Fourth Amendment. The majority

acknowledges that in *State v. Eason,* 2001 WI 98, ¶¶ 60–63, 245 Wis. 2d 206, 629 N.W.2d 625, we concluded that the federal good faith exception to the exclusionary rule did not sufficiently deter illegal government activity. Majority op., ¶ 37. But contrary to its assertion, *Eason* is not the only case in which we declined to follow lockstep the Supreme Court.[10] The majority's own discussion admits of another occasion in which we interpreted Article I Section 11 more expansively than the existing interpretation of the Fourth Amendment. *See* majority op., ¶ 29 (discussing *Laasch v. State,* 84 Wis. 2d 587, 595–97; 267 N.W.2d 278 (1978)).

¶ 132. Here, the officers had probable cause to arrest Felix. *See id.,* ¶ 28. Additionally, they had ample time to secure a warrant for his arrest, given that they secured a warrant to search the crime scene, and the affidavit in support of that warrant named Felix as the suspect. *Id.,* ¶ 8. Nevertheless, despite ample opportunity and the constitutional protections afforded to the home, the officers apparently decided that there was no

---

[10] *See also State v. Knapp,* 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899 (excluding evidence under Article I, Section 8 of the Wisconsin Constitution, even though it would not have been excluded under the United States Supreme Court's interpretation of the Fifth Amendment). In *Knapp,* we stated: "This 'lock-step' theory of interpreting the Wisconsin Constitution no broader than its federal counterpart appears to be aimed at promoting uniformity in the law. Uniformity may be advantageous, but it cannot be indispensable. It is the prerogative of the State of Wisconsin to afford greater protection to the liberties of persons within its boundaries under the Wisconsin Constitution than is mandated by the United States Supreme Court." *Id.,* ¶ 59.

need to secure an arrest warrant prior to confronting Felix at his apartment.[11]

¶ 133.   Under these circumstances, the officers' illegal conduct should not be sanctioned with a categorical exception to the exclusionary rule. I conclude that the *Harris* per se rule is an ineffective deterrent for *Payton* violations, and that any advantage of the rule does not outweigh the potential loss of liberty to the people of this state. I would remand to the circuit court to determine whether, under the *Brown* attenuation analysis, Felix's signed statement, the buccal swab, and Felix's clothing were sufficiently attenuated from the illegal arrest that they should not be suppressed.[12] Accordingly, I respectfully dissent.

¶ 134. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.

---

[11] The officers procured additional evidence against Felix when they searched the apartment his family was renting. Apparently, a man named Dean Kudick rented the apartment and sublet it to the Felix family, and it was Kudick who consented to the officers' request to search. *See* majority op., ¶ 11. This court has not been asked to decide whether Kudick had common authority over the apartment so that he could consent to the search, *see Georgia v. Randolph*, 547 U.S. 103 (2006), and accordingly the majority does not decide that issue.

[12] *See State v. Walker*, 154 Wis. 2d 158, 187–88, 453 N.W.2d 127 (1990) (remanding for the fact-finding necessary to conduct the *Brown* attenuation analysis).